IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| STEVE AND DAWN CANNON as the surviving parents of JOSH CANNON and as Executors of the Estate of JOSH CANNON,<br><br>　Plaintiffs<br><br>　　v.<br><br>SHERIFF JOHN CARY BITTICK and DEPUTY MATTHEW PRICE,<br><br>　Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:　5:05-CV-176 (WDO)<br>:<br>:<br>:<br>:<br>: |

**ORDER**

Plaintiffs Steve and Dawn Cannon sued Sheriff John Cary Bittick and Deputy Matthew Price based on the death of their son while in the Defendants' custody. Plaintiffs asserted claims pursuant to 42 U.S.C. §1983 alleging (1) excessive force based on Deputy Price's alleged used of a "chokehold" on Josh Cannon and (2) failure to train by Sheriff Bittick. The state law claims against these Defendants allege wrongful death and battery as well as a "survival action" by the estate. The matter is now before the Court on the Defendants' motion for summary judgment.

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Supreme Court has explained that the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving

party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23.  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact."  Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  Id. (citation omitted).  "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984)).  With this standard in mind, the facts set forth below are the material, undisputed facts that must be considered in ruling on Defendants' motion for summary judgment.

Beginning in June or July of 2000, Josh Cannon, who was 20 years old at the time,

began experiencing psychotic episodes in which he suffered from hallucinations, paranoia and insomnia. He was thereafter voluntarily hospitalized for a week but later discontinued his prescribed medication. In October of 2003, the delusions returned and gradually worsened over the next month. On or about November 10, 2003, Josh had an altercation with his parents during which he poked his father in the chest and waved a plate over his mother's head in a threatening manner saying "kill the bitch." As a result of his continually escalating psychosis, Mr. and Mrs. Cannon took Josh to his psychiatrist, Dr. Bearden, but Josh refused treatment. Dr. Bearden prescribed medication and suggested the Cannons apply to the Probate Court to have Josh involuntarily committed.

That same day, the Cannons obtained an Order of Involuntary Commitment from the Probate Court of Monroe County. The judge signed an Order to Apprehend commanding any peace officer of the county to take Josh Cannon into custody and deliver him to the Monroe County Hospital for an examination as prescribed by law. The order noted that Josh's recent behavior presented a substantial risk of imminent harm to himself and others. The Order was given to Deputy Price who handcuffed and transported Josh from the courthouse to the hospital.

Upon their arrival at the hospital, a nurse asked Price to remove the handcuffs so that Cannon's blood pressure could be taken and Price removed the cuffs. Nurse Judy Kornegay came into the room to collect a blood sample but Cannon was uncooperative and indicated he did not want his blood taken. Cannon finally indicated Kornegay could stick him but only on the top of his hand. When Kornegay started to insert the needle, Cannon suddenly jumped

off the bed and pushed Kornegay and Darden. Darden managed to get a handcuff on Cannon's right wrist as Cannon kicked him, stomped him and swung at him. Price jumped over the bed and threw himself on Cannon's back to pull him off Darden. Price could not pull Cannon off Darden because Cannon was "too strong." Price struck Cannon with his fist on the back, arms and shoulders. It was not until he grabbed Cannon by the head that Cannon momentarily stopped attacking Darden. Cannon spun around and grabbed Price's gunbelt then the handle of his gun. Cannon unsnapped one of the two snaps on the holster and pulled the gun up but the second snap held it in place. Price started punching Cannon at which point Cannon let go of the gun and returned to attacking Darden. Darden also had a gun on his holster and it did not have the second snap that had enabled Price to retain his gun. The three continued to fight and Price grabbed Cannon around the head and neck again and they all fell back to the ground. A firefighter, George Screws, was in the emergency room for medical treatment. He heard the scuffle, looked into the room and saw Cannon throwing punches at the officers. He also saw Cannon reach down, grab the deputy's gun and try to pull it from the holster. Screws entered the fray to assist the officers. He testified that he had never seen anybody that small fight that hard in his life. Nurse Kornegay testified that Cannon was "kicking all their butts." At one point Cannon pushed all three off him, stood up and with the metal cuffs swinging, continued to punch at the officers. All three kept yelling at Cannon to stop resisting, to relax, to put his hands behind his back, that nobody wanted to hurt him and that everything would be fine. Screws had Cannon's right arm but could not get the left arm because Cannon was fighting so hard. Darden was trying to control

Cannon's legs but Cannon continued to kick.  Price then wrapped his arms around Cannon's head in a headlock but was not squeezing Cannon's head.  Darden finally managed to get his radio and called for backup.  Deputy Chad Beck arrived and cuffed Cannon's left hand.  Cannon then stopped resisting but fought up to the point when Beck came into the room.  The officers and Screws then stood up and noticed that Cannon appeared to be unconscious.  Medical assistance was summoned immediately and CPR was performed.  Cannon was eventually transferred to the Medical Center of Central Georgia but never regained consciousness.  He was taken off life support after nearly two weeks and passed away.

An autopsy performed by GBI medical examiner and forensic pathologist Dr. Geoffrey Smith revealed the following pertinent findings:

- there was no trauma to the head;
- the bruises on Cannon's chest, hands and arms may have resulted from the fight;
- abrasions and bruises on Cannon's neck were likely the result of hospital procedures considering that Cannon had been in the hospital for nearly two weeks;
- there were no visible injuries to Cannon's neck that clearly came from the fight;
- the internal examination of the neck revealed no damage;
- while choking could not be ruled out, it could not be ruled in;
- there was no evidence of suffocation; and
- any pressure on the chest or neck further compromised breathing but the amount of pressure needed or actually applied in this case was impossible to quantify.

The autopsy report stated that the cause of death was acute bronchopneumonia as a consequence of cardiorespiratory arrest due to physical restraint during an acute psychotic episode.

Sheriff's Department Investigator Brad Christensen went to the hospital on the evening of the occurrence and interviewed all of the participants as part of the customary "use of force" investigation. Price told Christensen he had applied a chokehold on Cannon. Chokeholds are prohibited under Monroe County Sheriff's Department policy. The Sheriff determined that Price's hold on Cannon was a "headlock" rather than a "chokehold" because Price had not applied pressure to Cannon's *neck* for the purpose of cutting off Cannon's breathing. Rather, Price had Cannon in a headlock to hold his head still in an attempt to cuff Cannon and Cannon continued to struggle, yell and scream even after Price had him in a headlock. Nurse Kornegay stated that she did not see a chokehold. Screws characterized Price's hold on Cannon as a "headlock" and did not see Price's hands around Cannon's neck or throat. Investigator Christensen determined the use of force was justifiable and no disciplinary action was taken.

The Monroe County Sheriff's Department has a nationally recognized accreditation and its policies include instructions on transportation of mentally ill persons and on the use of force. Deputies, including Deputy Price, receive extensive training even beyond the state-mandated instruction and certification. A chain of command is in place that provides oversight and instruction to the deputies. Deputy Price's training, as of November 10, 2003, included basic mandate training and use of force training. He is familiar with the use of force policy and has never been disciplined except for a minor infraction as a jailor when he left a door propped open and knows of no citizen or inmate complaints against him.   ***Excessive Force Claim***

To establish a Fourth Amendment excessive force claim, Plaintiffs must establish that (1) there was a seizure and (2) the use of force was unconstitutionally unreasonable. Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989).  Because Josh Cannon was unquestionably "restrained" pursuant to the court's order that he was not permitted to leave the hospital, there was a "seizure."  The next question is whether the force used by the deputies was unreasonable.  In Graham, the Supreme Court instructed that an objective reasonableness standard is appropriate that requires lower courts to analyze the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396 (citation omitted).  The facts and circumstances must be viewed in "the perspective of a reasonable officer on the scene, rather than 20/20 vision of hindsight."  Id.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." Id. at 396–97.

Whether Deputy Price used a headlock or a chokehold, considering the totality of the circumstances presented in this case, his actions were not unconstitutional. See Williams v. Kelley, 624 F.2d 695 (5th Cir. 1980) (When an intoxicated detainee was involved in a fight with two officers during which a chokehold was used, he eventually became unconscious and died but the court found no constitutional violation because the officers acted reasonably to protect their own and others' safety and the chokehold was not intended to inflict harm); Post

7

v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (Where an officer used a chokehold for approximately five seconds to stop an arrestee from becoming violent, no constitutional violation was found because a reasonable officer could have concluded that the technique used was needed to stop the arrestee from becoming violent).  In the case at bar, there was a reasonably perceived life-threatening need for the application of force used against Josh Cannon.  The Deputies were under a Court Order to detain and transport Cannon for psychological treatment and had been apprised of Cannon's previous psychotic behavior.  Cannon tried to leave the hospital room several times.  Cannon did not comply with the officers' or the nurses' verbal commands.  All of the individuals involved perceived Cannon to be a serious threat once he jumped off the table and pushed the nurse.  Cannon posed a grave danger to everyone in the vicinity of the hospital when he attempted to get Price's gun considering that Darden also had a gun that could have been taken away more easily.  Moreover, the deposition testimony clearly shows the deputies and nurses were mindful of Cannon's needs and sympathetic to his situation.  For instance, when Deputy Price tried to initially get Cannon in the car to ride from the courthouse to the hospital, Cannon was hallucinating about something being on his foot and did not want to place his foot in the car.  Price indulged Cannon and pretended to brush off whatever Cannon thought he saw on his foot.  Later at the hospital, Cannon insisted on having orange juice before he would allow Nurse Kornegay to take a blood sample.  Kornegay immediately went and got Cannon some orange juice.  Although the Court is certainly sympathetic to the Plaintiffs' tragic loss and understands their personal devastation from this agonizing situation, there was no

*constitutional violation* by any of the Defendants in this case.  The deputies were doing what the Plaintiffs requested and the judge ordered - seeing that Josh Cannon received the psychological and medical assistance he so desperately needed and that the Plaintiffs had unfortunately become unable to provide.  Based on the facts presented in this case, construed in the light most favorable to the Plaintiffs and to Josh Cannon, the Court finds there was no Fourth Amendment violation and that claim is DISMISSED.

### *Failure to Train Claim*

Because the Court finds there was no unconstitutional use of excessive force, the "failure to train" claim must likewise be dismissed.  However, even if the Court found there had been a Fourth Amendment violation, the facts in this case do not warrant holding the Sheriff liable for his deputies' allegedly unconstitutional actions.  "Supervisory liability 'occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003) (citations omitted).  The Monroe County Sheriff's Department has a nationally recognized accreditation.  Its policies include clear instructions on the transportation of mentally ill individuals and on the use of force.  Deputies receive frequent, extensive training beyond that mandated by the state.  An appropriate chain of command is in place and provides oversight and instruction to the deputies.  The Sheriff had in place all that was necessary to ensure Josh Cannon's rights were not violated - clear, appropriate written policies and frequent, thorough training for all officers.  The Failure to Train claim is therefore DISMISSED.

*State Law Claims*

Because the Court has dismissed all federal claims over which it had original jurisdiction, it declines to exercise supplemental jurisdiction over the state claims and those claims are DISMISSED WITHOUT PREJUDICE.  See 28 U.S.C. § 1367(c)(3).

**SO ORDERED this 18th day of June, 2006.**

**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**